**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| GUARDANT HEALTH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. _____ |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| TEMPUS AI, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Guardant Health, Inc. ("Guardant") files this Complaint for Patent Infringement against Defendant Tempus AI, Inc. ("Tempus") and alleges as follows:

**OVERVIEW OF THE ACTION**

1.      Tempus has been using Guardant's groundbreaking, patented innovations in the field of cancer diagnostics.  On June 11, 2024, Guardant brought an action against Tempus in this District for infringement of certain of Guardant's patents, C.A. No. 24-687-GBW (the "First Infringement Suit"), which remains pending.

2.      Despite the First Infringement Suit, Tempus has continued its infringing activity. After the First Infringement Suit was filed, the U.S. Patent and Trademark Office issued U.S. Patent Nos. 12,116,640 (the "'640 Patent"), 12,312,634 ("the '634 Patent"), and 12,319,961 (the "'961 Patent") (collectively, the "Patents-in-Suit") to Guardant.  The patents also relate to cancer diagnostics, as do those asserted in the First Infringement Suit.  The Patents-in-Suit here further relate to the preparation and sequencing of cell-free DNA for the purpose of monitoring cancer patients after treatment and detecting residual disease, both markets in which Tempus unfairly competes with Guardant by using techniques that Guardant invented.  The '640 and '634 patents

describe methods of preparing and analyzing cell-free DNA to detect methylation to determine residual disease in cancer patients, a technology pioneered by Guardant.

3.      These innovations can result in life-saving treatment.  For example, after a patient receives surgery, blood biopsy testing can determine whether all the cancer was removed or whether there is a recurrence of cancer post-surgery.

4.      Tempus's infringement of the Patents-in-Suit has caused and is causing ongoing harm to Guardant.  Guardant brings this suit to stop Tempus's continued infringement and enjoin Tempus from practicing Guardant's patented inventions.  Guardant also seeks compensation for the infringement and injury that has already occurred.

## FACTUAL BACKGROUND

5.      Guardant is a leading precision oncology company dedicated to helping conquer cancer with data obtained through its proprietary blood tests.  Guardant was founded over a decade ago by Helmy Eltoukhy, Ph.D., and AmirAli Talasaz, Ph.D., pioneers in DNA sequencing and cancer diagnostics.  Since its inception, Guardant has focused its expertise on the development of groundbreaking liquid biopsy cancer tests, including Guardant360® CDx, the first FDA-approved liquid biopsy test.  To date, over 500,000 patient samples have been analyzed using Guardant's tests.  The FDA designated the Guardant360® CDx as a breakthrough device.  *See The Guardant360® Assay Receives Expedited Pathway Designation for Breakthrough Devices from FDA*,  https://investors.guardanthealth.com/press-releases/press-releases/2018/The-Guardant360-Assay-Receives-Expedited-Access-Pathway-Designation-for-Breakthrough-Devices-from-FDA/default.aspx.

6.      A liquid biopsy is the sampling and analysis of non-solid biological tissues, such as a patient's blood.  It is distinct from a conventional biopsy, which involves the removal of tissue

2

for examination and is often conducted surgically. All cells in the human body contain DNA. When a person's organ or tissues suffer from disease such as cancer, the DNA in the cells making up the organ or tissue may contain biomarkers that indicate the presence of the disease. Traditionally, a biopsy would need to extract cells from a particular organ or tissues of interest. The DNA from those cells would then be analyzed for biomarkers.

7. But pieces of DNA originating from cells in many different organs and tissues also circulate freely in the human bloodstream. These DNA fragments circulating in the bloodstream are known as "cell-free DNA" or "cfDNA." A simple, non-invasive blood draw can capture cell-free DNA originating from cells in many different organs and tissues all at once, including tumor tissue. That DNA can then be analyzed for relevant biomarkers indicating the presence of disease. But using cell-free DNA in the bloodstream to look for biomarkers raises substantial complexity and problems. A traditional biopsy provides a very large sample of DNA from a particular type of tissue (e.g., tumor). With cell-free DNA, very small numbers of DNA fragments originating from the cells of interest may be present, mixed in with very large numbers of DNA fragments from many other healthy cells.

8. Guardant is a pioneer in the field and solved many of the problems critical to unlocking the use of cell-free DNA to detect cancer and other disease in the blood. For example, Guardant was one of the first companies to commercialize a comprehensive liquid biopsy test to identify genomic biomarkers. Guardant's liquid biopsy technology enables patients, including those who are ineligible for traditional tissue biopsies, to obtain detailed genomic information about their cancer. Guardant's technology also allows patients to be screened for a large number of potential cancers or diseases that may be present in different parts of the body, all with a simple blood draw.

9.      For example, the Guardant360® CDx test is a liquid biopsy test that provides clinically actionable information from a routine blood draw taken from cancer patients.  From the extracted cell-free DNA, the test sequences a panel of genes commonly mutated in cancer and detects genetic aberrations such as single nucleotide variants, indels (insertions or deletions of nucleotides), gene fusions, and copy number variants.

10.     Guardant also markets liquid biopsy tests, such as Guardant Reveal™, that provide clinically actionable information regarding recurrence of disease after treatment.  These tests sequence genomic regions that display epigenetic (e.g., methylation) and genetic aberrations (e.g., single nucleotide variants) associated with disease recurrence.

11.     In addition to the FDA-approved Guardant360® CDx test, Guardant currently offers six other tests:  the Guardant360® laboratory developed test (LDT), the Guardant360 Response™, Guardant360 TissueNext™, Guardant Infinity™, Guardant Reveal™, and Shield™ tests.  These tests span the cancer care continuum, including early cancer screening, treatment selection, and residual disease and recurrence monitoring.

12.     Guardant's liquid biopsy technology has several additional advantages when compared to traditional tissue biopsies.  Traditional tumor-based genotyping tests are limited in the number of genes interrogated, require invasive biopsies, and often take upwards of 15 days before results are generated.  Guardant's liquid biopsies are less painful and do not require hospital services.  This technology is also less expensive and generates results in a shorter period of time, often in less than a week.  Further, cfDNA samples allow for the detection of mutations that may be missed by a tissue biopsy sample.

13.     Guardant's technology is built on a series of cutting-edge innovations that Guardant's scientists developed over many years and at great cost through an extensive research

4

and development program.  Guardant's innovations are protected by over 98 patents issued by the

United States Patent and Trademark Office, including the Patents-in-Suit.  These patents were

issued in recognition of the novelty and usefulness of Guardant's patents.

14.     Tempus was founded in 2015.  Since its inception, Tempus has capitalized on

Guardant's pioneering efforts to develop copy-cat cell-free DNA liquid biopsy tests.  Tempus was

formerly known as Tempus Labs, Inc.

15.     Tempus makes, markets, and uses liquid biopsy tests in ways that practice

Guardant's Patents-In-Suit.  One such category of liquid biopsy test includes products known as

Tempus xM Tests.  These include the Tempus xM Monitor, MRD and TRM, which will be referred

to herein as the "Accused xM Tests."  The Accused xM Tests incorporate liquid biopsy tests known

as Tempus xF and Tempus xF+ ("xF Tests").

16.     On information and belief, Tempus has been monitoring Guardant's intellectual

property portfolio while making the Accused xM Tests.  For example, in Tempus's S-1 filing dated

May 20[1] Tempus stated the following:

> The intellectual property landscape in the next generation
> sequencing, generative AI, and other fields in which we operate
> continues to evolve in ways that may impact our business.  For
> example, we are aware of patent litigation involving certain
> disciplines in which we operate, such as liquid biopsy sequencing
> methods and minimal residual disease testing methods.  While we
> are not a party to these suits, many of our competitors are or have
> been, including Guardant Health, Inc., Haystack Oncology, Inc.,
> Invitae Corp., Illumina, Inc., Natera, Inc., NeoGenomics
> Laboratories, Inc., Personalis, Inc., TwinStrand Biosciences, Inc.,
> and others, and, as a result, we have monitored and continue to
> monitor their developments and their potential impact on the
> Company.  Given the uncertainty of outcomes of patent litigation
> disputes, we have not determined whether our products and services
> could be subject to potential claims of patent infringement based on

---

[1] Available at
https://www.sec.gov/Archives/edgar/data/1717115/000119312524142956/d221145ds1.htm.

the patents at issue in these or other cases, whether we may need to modify or change any existing or planned sequencing procedures, or whether any of the patents at issue are valid or enforceable against us. However, it is possible that we will be subject to claims of patent infringement and that we may need to either modify our existing or future sequencing methods or license intellectual property from third parties, both of which could be time consuming and expensive.

17.    As shown above, Tempus "monitored and continue[s] to monitor" patent litigation involving Guardant and the potential impact of Guardant's patents on Tempus. Tempus also understands that because of Guardant's intellectual property, Tempus may need to "modify [its] existing or future sequencing methods."

18.    Tempus is also aware of Guardant's intellectual property at least as of June 11, 2024, because Guardant stated, in its complaint in the First Infringement Suit, that Guardant has over 95 patents protecting its innovations. Complaint, C.A. No. 24-687-GWB, D.I. 1, ¶ 9.

19.    Tempus has achieved market success with its Accused Tests. But, as described below, that success derives from Tempus's unauthorized use of Guardant's pioneering inventions.

## THE PARTIES

20.    Guardant is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business at 3100 Hanover Street, Palo Alto, CA 94034.

21.    Tempus is a corporation organized and existing under the laws of the state of Delaware. Its principal place of business is 600 West Chicago Avenue, Suite 510, Chicago, Illinois 60654.

## JURISDICTION AND VENUE

22.    This civil action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including without limitation 35 U.S.C. §§ 271, 281, 283, 284, and 285. Accordingly, this Court has subject matter jurisdiction under, *inter alia*, 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202. This Court has personal jurisdiction over Tempus because Tempus is subject to general and

specific jurisdiction in the state of Delaware. Tempus is subject to personal jurisdiction at least because Tempus is a Delaware corporation and resides in this District. Tempus has made certain minimum contacts with Delaware such that the maintenance of this suit does not offend traditional notions of fair play and substantial justice.

23.    The exercise of personal jurisdiction comports with Tempus's right to due process because, as described above, Tempus has purposefully availed itself of the privilege of Delaware corporate laws such that it should reasonably anticipate being haled into court here.

24.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) because, among other things, Tempus is incorporated in Delaware.

### THE GUARDANT PATENTS-IN-SUIT

25.    On October 15, 2024, the United States Patent and Trademark Office lawfully issued U.S. Patent No. 12,116,640, entitled "Methods for Early Detection of Cancer." A true and correct copy of the patent is attached hereto as Exhibit A. Guardant is the owner and assignee of all right, title, and interest in and to the '640 Patent, including the right to assert all causes of action arising under the '640 Patent and the right to sue and obtain any remedies for past, present, or future infringement.

26.    On May 27, 2025, the United States Patent and Trademark Office lawfully issued U.S. Patent No. 12,312,634, entitled "Methods and Systems for Analyzing Nucleic Acid Molecules." A true and correct copy of the patent is attached hereto as Exhibit B. Guardant is the owner and assignee of all right, title, and interest in and to the '634 Patent, including the right to assert all causes of action arising under the '634 Patent and the right to sue and obtain any remedies for past, present, or future infringement.

27.    On June 3, 2025, the United States Patent and Trademark Office lawfully issued U.S. Patent No. 12,319,961, entitled "Methods and Systems for Detecting Genetic Variants." A

true and correct copy of the patent is attached hereto as Exhibit C. Guardant is the owner and assignee of all right, title, and interest in and to the '961 Patent, including the right to assert all causes of action arising under the '961 Patent and the right to sue and obtain any remedies for past, present, or future infringement.

<u>**TEMPUS'S INFRINGEMENT OF GUARDANT'S PATENTS-IN-SUIT**</u>

28.    On or around September 14, 2018, Tempus announced the release of its Tempus xF liquid biopsy test, describing it as "a non-invasive genomic sequencing panel" that "analyzes 77 genes." *See Tempus Adds Tempus xF, a Liquid Biopsy Assay, to Sequencing Capabilities press release*, https://www.tempus.com/news/pr/tempus-adds-tempus-xf-a-liquid-biopsy-assay-to-sequencing-capabilities/ (last visited July 8, 2025). On or around July 12, 2021, Tempus published a press release announcing the results of a validation study purporting to demonstrate "the reliable analytical performance of the Tempus xF liquid biopsy." *See Tempus xF Liquid Biopsy Assay Demonstrates Extensive Analytical and Clinical Validity in npj Precision Oncology Study*, https://www.tempus.com/news/pr/tempus-xf-liquid-biopsy-assay-demonstrates-extensive-analytical-and-clinical-validity-in-npj-precision-oncology-study/ (last visited July 8, 2025).

29.    The validation study for Tempus xF was authored by scientists affiliated with Tempus, including J. Finkle, and is titled "Validation of a liquid biopsy assay with molecular and clinical profiling of circulating tumor DNA." It was published in the Journal of Precision Oncology on July 2, 2021. On information and belief, this paper describes the methodology that Tempus uses in its Tempus xF liquid biopsy test. This paper will be referred to as "Finkle" and is attached as Exhibit D.

30.    Tempus published an additional validation study authored by scientists affiliated with Tempus, entitled "Analytical Validation of Next-Generation Sequencing-Based Comprehensive Liquid Biopsy Assay for Therapy Selection." It was published in the Journal of

Molecular Diagnostics on February 6, 2025. On information and belief, this paper describes the methodology that Tempus uses in its Tempus xF+ liquid biopsy test. This paper will be referred to as "Boulos," and is attached as Exhibit E.

31.    On or around November 3, 2023, Tempus published a press release announcing the launch of Tempus xM Monitor which it describes as measuring "quantitative molecular changes in ctDNA tumor fraction by utilizing diverse genomic events, dynamically weighting somatic variant allele frequencies and copy number variants." *Tempus Announces New ctDNA Assay, xM Monitor*, https://www.tempus.com/news/tempus-announces-new-ctdna-assay-xm-monitor/ (last visited June 26, 2025). In the same press release, Tempus stated that xM Monitor was formerly named xF Monitor. Tempus described the xM monitor product as an "algorithm" that calculates "ctDNA tumor fraction" which may be used with "both Tempus' 105-gene liquid assay, xF, and Tempus' 523-gene liquid assay, xF+." *Id.*

32.    On or around November 1, 2023, a poster authored by scientists affiliated with Tempus was presented at the 2023 Society for Immunotherapy of Cancer meeting titled "Association of a novel circulating tumor fraction DNA biomarker of treatment response monitoring and clinical outcomes in a real-world, diverse pan-cancer cohort treated with immunotherapy." In this poster, Tempus also describes xM Monitor (which it calls xF Monitor) as an algorithm used in conjunction with the xF assay: "xF Monitor is a novel, sensitive, serial quantitative ctFE algorithm which runs off the Tempus xF assay that has the potential to be used clinically as a dynamic predictive biomarker to ICI therapy." This poster will be referred to as "Guittar," and is attached as Exhibit F.

33.    On or around March 22, 2024, a poster authored by scientists affiliated with Tempus was presented at the American Association for Cancer Research Annual Meeting 2024

9

titled "Association of a ctDNA biomarker of treatment response with clinical outcomes in a real-world pan-cancer cohort treated with tyrosine kinase inhibitors."  In this poster, Tempus also describes xM Monitor as a "serial quantitative ctDNA TF algorithm that has the potential to be used clinically as a dynamic quantitative biomarker to evaluate response to TKI therapy."  This poster will be referred to as "Mitra," and is attached as Exhibit G.

34.     On or around July 22, 2024, a paper authored by scientists affiliated with Tempus was published in the journal Oncology and Therapy titled "Dynamic Changes in Circulating Tumor Fraction as a Predictor of Real-World Clinical Outcomes in Solid Tumor Malignancy Patients Treated with Immunotherapy."  This paper states that it describes an evaluation of a "circulating tumor DNA (ctDNA) assay, xM, used for treatment response monitoring (TRM), that quantifies changes in ctDNA tumor fraction (TF)."  The paper further describes use of a liquid biopsy NGS assay that was described in Finkle—that is, the Tempus xF assay.  *Id.*, 5.  This paper will be referred to as "Gentzler," and is attached as Exhibit H.

35.     On or around June 2, 2025, Tempus published a press release announcing the launch of an xM assay for monitoring clinical response to immune checkpoint inhibitors which it calls xM TRM.  Tempus describes xM TRM as "intended to detect molecular response to immune-checkpoint inhibitor (ICI) therapy in advanced solid tumors."  *Tempus Introduces xM, An Assay to Monitor Immunotherapy Response for Patients with Advanced Cancers*, https://investors.tempus.com/news-releases/news-release-details/tempus-introduces-xm-assay-monitor-immunotherapy-response (last visited July 8, 2025).  In this same press release, Tempus stated that xM TRM, "is the newest addition to Tempus' growing portfolio of sensitive assays for monitoring molecular response and minimal residual disease (MRD)."  Tempus further stated it would "present[] new data on xM for TRM at the 2025 American Society of Clinical Oncology

(ASCO®) Annual Meeting, highlighting the assay's potential to help clinicians monitor response and refine treatment strategies for patients with advanced cancers."

36.     On or around June 2, 2025, a poster authored by scientists affiliated with Tempus was presented at the 2025 American Society of Clinical Oncology (ASCO®) Annual Meeting titled "A molecular biomarker for longitudinal monitoring of therapeutic efficacy in a real-world cohort of advanced solid tumors treated with immune checkpoint inhibitors." The poster states that "ctDNA TF was quantified for each sample via an ensemble algorithm, xM for Treatment Response Monitoring, that uses pathogenic variant allele frequencies, copy number information, and germline information." This poster will be referred to as "Guittar Poster," and is attached as Exhibit I.

37.     On or around January 18, 2024, Tempus published a press release announcing the launch of Tempus xM MRD, which it described as a process to "Assess Minimal Residual Disease." *Tempus Introduces xM MRD to Assess Minimal Residual Disease (MRD) in Patients with Colorectal Cancer (CRC) for Research Use Only*, https://www.tempus.com/news/tempus-introduces-xm-to-assess-minimal-residual-disease-mrd-in-patients-with-colorectal-cancer-crc-for-research-use-only/ (last visited July 8, 2025). In this same press release, Tempus stated that the xM MRD "assay delivers a binary MRD assessment based on both methylation and genomic variant MRD classifiers+." On information and belief, Tempus performs the xM MRD tests at facilities in the United States on a regular basis.

38.     On or around May 31, 2024, Tempus published a press release announcing the clinical launch of its Minimal Residual Disease (MRD) portfolio. Tempus's MRD portfolio includes xM MRD, which it described as a "tumor-naïve assay . . . designed to help detect residual disease or early cancer recurrence and monitor for immunotherapy treatment response." *Tempus*

*Announces    the    Clinical    Launch    of    its    MRD    Testing    Portfolio*,
https://www.tempus.com/news/tempus-announces-the-clinical-launch-of-its-mrd-testing-
portfolio/ (last visited June 25, 2025).  In this same press release, Tempus stated that xM MRD "is
designed to detect circulating tumor DNA (ctDNA) in the blood of patients with early stage
colorectal cancer (CRC) after curative intent surgery."

39.    On or around January 15, 2025, a paper authored by scientists affiliated with
Tempus was published in Clinical Cancer Research titled "A Tumor-Naive ctDNA Assay Detects
Minimal Residual Disease in Resected Stage II or III Colorectal Cancer and Predicts Recurrence:
Subset Analysis from the GALAXY Study in CIRCULATE-Japan."  The paper describes "the
clinical validation of Tempus xM (xM), a tumor-naive MRD assay that integrates both methylation
and genomic variant data to output a single binary value."  This paper will be referred to as
"Nakamura," and is attached as Exhibit J.

40.    When using the Accused xM Monitor and TRM Tests, Tempus subjects samples to
Tempus xF or xF+ Tests then performs additional data processing using an algorithm to determine
ctDNA tumor fraction.  On information and belief, Tempus performs the xF and xF+ tests at
facilities   in   the   United   States   on   a   regular   basis.   (https://www.tempus.com/wp-
content/uploads/2024/03/Tempus-
xF_Validation.pdf?srsltid=AfmBOorVtnfUPIa2fm4IUHk4C5G3egL4gWjxCuOmS19e2IUo5s--
GO2a).  When using the Accused xM Tests, Tempus obtains samples of cell-free DNA from
subjects.  The cell-free DNA is ligated to adapters, including ligating unique molecular identifiers
(UMIs) to the ends of each cell-free DNA fragment, with these UMIs including 96 different pairs
of barcodes.  On information and belief, Tempus uses a quantity of adapters having a number of

moles more than ten times the number of moles of cell-free DNA in the sample, and these adapters are ligated to the cell-free DNA with an efficiency of 20 percent or more.

41.    After ligating the adapters to a cell-free DNA sample, Tempus amplifies and sequences the ligated cell-free DNA to generate sequence reads. Tempus determines single nucleotide variants (SNVs) and copy number variants from the sequence reads. Tempus further calculates differences in the amounts of SNVs and CNVs at multiple timepoints to monitor a patient's disease status.

42.    When using the Accused Tempus xM MRD Test, Tempus splits the sample into two portions. Tempus analyzes the first portion for genetic variants associated with cancer. On information and belief, the first portion is analyzed using the Tempus xF or xF+ Tests. Tempus analyzes the second portion for methylation. Tempus designates a sample as positive for minimal residual disease when the methylation portion indicates the presence of disease and at least one genetic variant is determined.

## FIRST COUNT
### (Infringement of '640 Patent) (At Least the Accused xM MRD Test)

43.    Guardant repeats and re-alleges the foregoing paragraphs as if set forth specifically herein.

44.    The claims of the '640 Patent are valid and enforceable.

45.    The claims of the '640 Patent are directed to patentable subject matter. The '640 Patent is directed to new techniques for preparing and sequencing cell-free DNA for cancer detection. '640 Patent at Abstract.

46.    Detection of residual disease requires high-sensitivity as diagnostic variants may be present at exceedingly low frequencies (e.g., 0.001%) in cell-free DNA. '640 Patent at 15:2-5. The '640 Patent provides inventive and unconventional methods for "high sensitivity detection"

such that "residual disease" may be detected at its earliest stages.  '640 Patent at 1:57-60, 2:17-24, 11:20-25.

47.    Prior to the '640 Patent, detection of residual disease was not possible using liquid biopsies.  Instead, detection required invasive screening procedures such as the use of colonoscopy to screen for colorectal cancer.  The '640 Patent claims solve the deficiencies in the prior art by describing an innovative technique for preparing, sequencing, and analyzing cell free DNA samples, including a new technique for focusing finite sequencing resources on a relatively small number of highly informative regions on the genome.  '640 Patent at 14:51-15:12

48.    The '640 Patent thus provides a new and unconventional method of preparing cell free DNA for sequencing and analysis that was not known the prior art.  Sequencing panels may be designed to provide improved detection of, for instance, colorectal cancer by including genetic regions known to be variant in that cancer.  '640 Patent at 25:9-26:55.  The '640 Patent also explains that sequencing panels may be constructed to "allow for interrogating methylation status and genetic variants" associated with residual disease.  '640 Patent at 14:51-15:15.  The '640 Patent further explains that sequencing panels may be selected to achieve a desired sequencing read depth.  '640 Patent at 24:14-28.  Increased sequencing read depth improves sensitivity and thus allows detection of low frequency variants such as those associated with residual disease.

49.    The '640 Patent's claims are directed to the innovative laboratory techniques involving preparing cell free DNA for sequencing and analysis, which comprise specific process steps for constructing sequencing panels.  Claim 1, for example, recites:

> 1. A method for detecting a presence or absence of residual disease in a subject, the method comprising:
>
> (a) enriching cell-free deoxyribonucleic acid (cfDNA) molecules or amplicons thereof from a sample of the subject using sequence capture for a sequencing panel of genes or genomic regions to generate the sequencing panel, wherein the sequencing panel:

(i) is at least 150kb,

(ii) comprises a plurality of genes or genomic regions having CpG islands which are differentially methylated regions,

(iii) comprises a plurality of genes or genomic regions known to be associated with one or more cancers,

wherein the subject previously received a treatment for cancer and the sample was obtained from the subject after the treatment;

(b) sequencing a plurality of enriched cfDNA from the sequencing panel to generate sequencing data; and

50.    (c) determining methylation profiles of the cfDNA molecules and detecting a presence or absence of one or more genetic variants in the cfDNA molecules from the sequencing data to detect the presence or absence of residual disease in the subject. Claim 1 and its dependent claims 2-30 are directed to new ways to detect residual disease accurately and with high sensitivity using sequencing panels.

51.    Reflecting the novel and unconventional nature of the '640 Patent claims, Guardant's Reveal product, which practices at least claim 1 of the '640 patent has received industry praise.  *See, e.g.*, https://www.onclive.com/view/guardant-reveal-test-is-effective-in-predicting-recurrence-in-stage-ii-and-higher-crc.

52.    The patented invention improved on prior art techniques by, *inter alia*, by enriching cfDNA molecules for a sequencing panel comprising differentially methylated regions and variant regions:

(a) enriching cell-free deoxyribonucleic acid (cfDNA) molecules or amplicons thereof from a sample of the subject using sequence capture for a sequencing panel of genes or genomic regions to generate the sequencing panel, wherein the sequencing panel:

(i) is at least 150kb,

(ii) comprises a plurality of genes or genomic regions having CpG islands which are differentially methylated regions,

> (iii) comprises a plurality of genes or genomic regions known to be associated with one or more cancers,

'640 Patent at cl. 1.

53.     These specific process steps were not dictated by any natural phenomenon and instead are human-engineered parameters to optimize sequencing sensitivity for detection of residual disease.

54.     The custom sequencing panels are used to determine differentially methylated and variant regions, and therefore determine whether disease is present or absent:

> determining methylation profiles of the cfDNA molecules and detecting a presence or absence of one or more genetic variants in the cfDNA molecules from the sequencing data to detect the presence or absence of residual disease in the subject.

55.     Prior to the '640 Patent, determining methylation profiles to detect residual disease was not conventional, nor was it conventional to determine both methylation profiles and genetic variants to detect residual disease.

56.     This innovation was not well-understood, routine, or conventional, as it involves specific methods of preparing and sequencing defined sequencing panels for determining methylation profiles of the cfDNA molecules and detecting a presence or absence of one or more genetic variants in the cfDNA molecules from the sequencing data to detect the presence or absence of residual disease in the subject.  These aspects, alone and in combination with other claimed elements, were not conventional, well-understood, or routine.

57.     Dependent claim 15 recites "wherein the sequencing is performed at a depth of at least 50,000 reads per base, at least 100,000 reads per base, or at least 120,000 reads per base" and claim 16 further requires "wherein the reads per base represent at least 5,000 original cfDNA molecules in the sample."  In addition, dependent claim 22 recites "wherein the cancer is detected at a specificity of at least 90% or greater" and claims 23 further requires "wherein the sequencing

panel is selected to detect the cancer at a positive predictive value (PPV) of at least 70%." These limitations were not routine or conventional at the time, including as shown by the prosecution history of the '640 patent.

58.     These specific process steps were not dictated by any natural phenomenon and instead are human-engineered parameters to optimize sequencing of cfDNA by, for example, using the claimed sequencing panels to achieve specific read depths, specificity and predictive powers.

59.     Dependent claim 17 recites "wherein the sequencing panel comprises a subpanel for identifying tissue of origin." These limitations were not routine or conventional at the time, including as shown by the prosecution history of the '640 patent.

60.     This specific process steps were not dictated by any natural phenomenon and instead are human-engineered parameters to optimize sequencing of cfDNA by, for example, designing sequencing panels such that the tissue from which the cfDNA originates may be identified.

61.     Additionally, not only are the elements identified above unconventional and innovative, the ordered combination of the elements of each of the '640 Patent claims recite an invention that is not routine or conventional.    For example, it was not well-understood, conventional, or routine to generate a sequencing panel "wherein the sequencing panel: (i) is at least 150kb, (ii) comprises a plurality of genes or genomic regions having CpG islands which are differentially methylated regions, [and] (iii) comprises a plurality of genes or genomic regions known to be associated with one or more cancers[.]" '640 Patent cl. 1.

62.     In sum, the '640 Patent claim elements, individually and as an ordered combination, present an innovative technique for selection and sequencing of cfDNA that was neither conventional nor routine nor well-understood.

63.     At least the Accused xM MRD Test, and Tempus's use of each of the Accused xM MRD Test, practices steps that are identical or equivalent to each claimed element of the patented invention pointed out by at least claim 1 of the '640 Patent.

64.     Tempus is not licensed or otherwise authorized to practice the claims of the '640 Patent.

65.     On information and belief, Tempus has infringed and continues to infringe at least claim 1 of the '640 patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, at least by its use of the Accused xM MRD Test within the United States, without authority.  As an example, attached as Exhibit K is a preliminary and exemplary claim chart illustrating one way in which Tempus infringes claim 1 of the '640 patent.

66.     As a result of Tempus's infringement of the '640 Patent, Guardant has suffered monetary damages, and seeks recovery, in an amount to be proven at trial, adequate to compensate for Tempus's infringement, but in no event less than a reasonable royalty with interest and costs.

67.     On information and belief, Tempus will continue to infringe the '640 Patent unless enjoined by this Court.  Tempus's infringement of Guardant's rights under the '640 Patent will continue to damage Guardant, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

## SECOND COUNT
### (Infringement of '634 Patent) (At Least the Accused xM MRD Test)

68.     Guardant repeats and re-alleges the foregoing paragraphs as if set forth specifically herein.

69.     The claims of the '634 Patent are valid and enforceable.

70.     The claims of the '634 Patent are directed to patentable subject matter.  The '634 Patent is directed to new laboratory techniques for preparing and analyzing genetic and epigenetic (e.g., methylation) variants in cell-free DNA.  '634 Patent at Abstract.

71.     The '634 Patent explains that "[c]ancer can be caused by the accumulation of genetics variations within an individual's normal cells," and that these variations "commonly include copy number variations (CNVs), single nucleotide variations (SNVs), gene fusions, insertions and/or deletions (indels)" as well as epigenetic variations such as 5-methylcytosine. '634 Patent at 1:38-46.

72.     Before the '634 Patent, cell-free DNA samples were not analyzed for methylation and genetic aberrations because doing so required splitting the sample into two aliquots which, given the small amounts of DNA in a typical cell-free DNA sample, was disadvantageous.  '634 Patent at 33:55-59.  The '634 Patent addressed this deficiency of the prior art by improvements to the efficiency of determining methylation patterns and genetic variants.

73.     Claim 1 and its dependent claims 2-20 are directed to new ways of efficiently preparing and analyzing cfDNA for the presence of genetic and epigenetic variation in the cfDNA that are diagnostic of residual disease or recurrence of disease.

74.     The '634 Patent's claims are directed to this inventive laboratory techniques for preparing and analyzing cell free DNA, which comprise specific process steps for preparing the sample of cell free DNA.  Claim 1, for example, recites:

> 1. A method of monitoring residual disease or recurrence of disease in a subject, wherein the disease is cancer, wherein the method comprises:
>
> (a) providing a sample comprising at least 10 ng of cell-free DNA (cfDNA);
>
> (b) splitting the sample into first and second aliquots;

(c) assaying cfDNA of the first aliquot to obtain sequence data of the first aliquot, irrespective of methylation state of the cfDNA, wherein the sequence data of the first aliquot is analysed for SNVs, indels and/or gene fusions and assaying cfDNA of the second aliquot to obtain sequence data comprising information on the methylation state of the cfDNA, wherein nucleic acids derived from the first aliquot and/or the second aliquot are subject to target capture, in which molecules having target sequences are captured for subsequent analysis; and

(d) analyzing the sequence data from the first and second aliquots to monitor residual disease or recurrence of disease.

75.    Claim 1 and its dependent claims 2-20 are directed to new ways of efficiently analyzing cfDNA for the presence of genetic and epigenetic variation in the cfDNA that are diagnostic of residual disease or recurrence of disease.

76.    These specific process steps were not dictated by any natural phenomenon and instead are human-engineered parameters to optimize sequencing of cell free DNA for genetic and epigenetic variants.

77.    These innovations were not conventional, well-understood, or routine. The USPTO found splitting the sample into first and second aliquots followed by performing a methylation and non-methylation-based analysis novel over the prior art.

> These [prior art] documents do not teach or suggest performing both methylation-based and non-methylation-based analysis on the same sample of cfDNA by splitting the sample into first and second aliquots, obtaining sequence data irrespective of methylation state from the first aliquot, and obtaining sequence data relating to methylation state from the second aliquot.

Exhibit U at 3-4.

78.    This innovation was not well-understood, routine, or conventional, as it involves specific methods of analyzing the sequence data from the first and second aliquots of cfDNA to monitor residual disease or recurrence of disease.

79.    Additionally, not only are the elements identified above unconventional and innovative, the ordered combination of the elements of each of the '634 Patent claims recite an invention that is not routine or conventional.  For example, it was not conventional, well-understood, or routine to split a sample of cfDNA into first and second aliquots, and then "assay[] cfDNA of the first aliquot to obtain sequence data of the first aliquot, irrespective of methylation state of the cfDNA, wherein the sequence data of the first aliquot is analyzed for SNVs, indels and/or gene fusions" and "assay[] cfDNA of the second aliquot to obtain sequence data comprising information on the methylation state of the cfDNA[.]"

80.    In sum, the '634 Patent claim elements, individually and as an ordered combination, present an innovative technique for aliquoting and sequencing of cfDNA that was neither conventional nor routine nor well-understood.

81.    At least the Accused xM MRD Test, and Tempus's use of the Accused xM MRD Test, practices steps that are identical or equivalent to each claimed element of the patented invention pointed out by at least claim 1 of the '634 Patent.

82.    Tempus is not licensed or otherwise authorized to practice the claims of the '634 Patent.

83.    On information and belief, Tempus has infringed and continues to infringe at least claim 1 of the '634 patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, at least by its use of the Accused xM MRD Test within the United States, without authority.  As an example, attached as Exhibit L is a preliminary and exemplary claim chart illustrating one way in which Tempus infringes claim 1 of the '634 patent.

84.     As a result of Tempus's infringement of the '634 Patent, Guardant has suffered monetary damages, and seeks recovery, in an amount to be proven at trial, adequate to compensate for Tempus's infringement, but in no event less than a reasonable royalty with interest and costs.

85.     On information and belief, Tempus will continue to infringe the '634 Patent unless enjoined by this Court. Tempus's infringement of Guardant's rights under the '634 Patent will continue to damage Guardant, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

**THIRD COUNT**
**(Infringement of '961 Patent) (At Least the Accused xM Tests)**

86.     Guardant repeats and re-alleges the foregoing paragraphs as if set forth specifically herein.

87.     The claims of the '961 Patent are valid and enforceable.

88.     The claims of the '961 Patent are directed to patentable subject matter.  The '961 Patent is directed to new laboratory techniques for detecting genetic variants such as copy number variations associated with a particular disease in cell free DNA for early disease detection.  '961 Patent at Abstract.

89.     Disorders that are caused by rare genetic mutations (e.g., sequence variations) or changes in epigenetic markers, such as cancer and partial or complete aneuploidy, may be detected or more accurately characterized with DNA sequence information.  *Id.* at 1:48-52.  Early detection and monitoring of genetic diseases are useful and needed to successfully treat or manage a disease. In the prior art, methods were developed to estimate copy number variations, but those methods involve preparing a sample by converting the original nucleic acids into a sequenceable library, followed by massively parallel sequencing, and then conducting a bioinformatic analysis to estimate the copy number variation at one or more loci.  *Id.* at 2:6–10.  The '961 patent states that

22

although known methods for detecting cfDNA could reduce the errors introduced by the sample preparation and sequencing processes for the molecules that are converted and sequenced, these methods are not able to infer the counts of molecules that were converted, but not sequenced. *Id.* at 2:14–22. The '961 patent states this inability to count converted but unsequenced molecules "can dramatically and adversely affect the sensitivity that can be achieved." *Id.* at 1:18–23.

90. The '961 Patent claims solve these deficiencies in the prior art by describing an innovative technique for sequencing and analyzing cell free DNA samples, including a new technique for tagging physical DNA strands and estimating the number of unseen molecules using a specific number of different combinations of molecular barcodes for tagging and using a mean of an expected number of duplicate molecules in a sample population.

91. The '961 Patent thus provides a new and unconventional way of sequencing and analyzing DNA samples not found in the prior art. For example, the '961 patent describes tagging and counting both halves of double-stranded DNA and estimating the number of unseen molecules based on the number of pairs (i.e., molecules where both strands were identified) and singlets (i.e., molecules where only one strand was identified) detected in a particular region. *See id.* at 2:23-39.

92. The '961 Patent's claims describe innovations for reducing or tracking redundancy of sequence reads for genetic testing by, *inter alia*, an unconventional method involving non-unique duplex tagging to infer information about DNA. *See, e.g.*, '961 Patent at cls. 1-30.

93. The '961 Patent's claims are directed to this inventive method of preparing cell free DNA, which comprise specific process steps involving non-unique duplex tagging to infer information about DNA. Independent Claim 1 of the '961 Patent, for example, recites:

> A method of monitoring a patient's disease status, wherein the method comprises:

(a) providing a sample comprising double-stranded polynucleotide molecules from the patient, wherein a double-stranded polynucleotide molecule includes first and second complementary strands;

(b) attaching adapters to a plurality of the polynucleotide molecules to generate tagged double-stranded polynucleotide molecules, wherein attaching adapters comprises ligation using more than a 10x excess of adapters as compared to the double-stranded polynucleotide molecules, wherein at least 20% of the double-stranded polynucleotide molecules are attached with adapters;

(c) amplifying a plurality of the tagged double-stranded polynucleotide molecules to produce amplified polynucleotides;

(d) sequencing at least some of amplified polynucleotides to produce a set of sequence reads;

(e) determining an amount of one or more single nucleotide variants (SNVs) or copy numbers of a plurality of genes from the set of sequence reads, wherein the set of sequence reads comprise paired reads and/or unpaired reads, wherein (i) each paired read corresponds to sequence reads generated from a first tagged strand and a second tagged complementary strand derived from a double-stranded polynucleotide molecule in said set, and (ii) each unpaired read represents a first tagged strand having no second tagged complementary strand derived from a double-stranded polynucleotide molecule represented among said sequence reads in said set of sequence reads; and

(f) repeating (a)-(e) at one or more time points and determining whether there is a difference in the amounts of SNVs, level of SNVs, or copy numbers between two or more time points, thereby monitoring a patient's disease status.

94.    Additionally, dependent claim 9 further recites "at least 40%" of the double-stranded polynucleotide molecules are attached with adapters.

95.    These specific process steps were not dictated by any natural phenomenon and instead are human-engineered parameters to optimize sequencing of cfDNA by, for example, reducing or tracking redundancy of sequence reads for genetic testing.

96.    The innovations in the '961 Patent claims were not conventional, well-understood, or routine.  During prosecution of the '961 Patent, the USPTO found that claim 1's limitations of "attaching adapters to a plurality of the polynucleotide molecules to generate tagged double-stranded polynucleotide molecules, wherein attaching adapters comprises ligation using more than a 10x excess of adapters as compared to the double-stranded polynucleotide molecules, wherein at least 20% of the double-stranded polynucleotide molecules are attached with adapters;" and "repeating (a)-(e) at one or more time points and determining whether there is a difference in the amounts of SNVs, level of SNVs, or copy numbers between two or more time points, thereby monitoring a patient's disease status" were novel and unconventional in view of the prior art. Exhibit N at 3-4.

97.    Indeed, the USPTO has repeatedly found that this innovation involving tagging at least 20% of the cfDNA molecules using more than a $10\times$ molar excess of adaptors and combinations with other elements were nonobvious over various proposed combinations of prior art asserted against related patents.  See Exhibit O at 11-15 (denying institution for failure to render limitation obvious), Exhibit P at 3-5 (confirming non-obviousness in denial of rehearing); Exhibit Q at 11-15 (denying institution for failure to render limitation obvious), Exhibit R at 3-5 (confirming non-obviousness in denial of rehearing).

98.    The USPTO also found the specific percentage "at least 20%" and "at least 40%" of the cfDNA molecules that must be tagged with duplex tags using more than a $10\times$ molar excess of adapters to be novel and nonobvious over the prior art.  Exhibit S at 37-43.  These specific process steps, which are not dictated by any natural law or phenomenon, are thus not conventional, routine, or well-understood.

99.     Even further, the innovations of the '961 Patent claims involve determining paired and unpaired molecules.  For example, independent claims 1 and 26 and their dependent claims 2-25 and 27-30 involve:

> determining an amount of one or more single nucleotide variants (SNVs) or copy numbers of a plurality of genes from the set of sequence reads, wherein the set of sequence reads comprise paired reads and/or unpaired reads, wherein (i) each paired read corresponds to sequence reads generated from a first tagged strand and a second tagged complementary strand derived from a double-stranded polynucleotide molecule in said set, and (ii) each unpaired read represents a first tagged strand having no second tagged complementary strand derived from a double-stranded polynucleotide molecule represented among said sequence reads in said set of sequence reads[.]

'961 Patent at cl. 1 (emphasis added).  The claimed determining of paired and unpaired molecules is unconventional, not routine, and not well-understood in the art.

100.    The Patent Office confirmed that detecting paired and unpaired molecules was a non-obvious technical improvement over the cited prior art.  *See* Exhibit S at 15-16, 27.  Thus, determining paired and unpaired molecules was not well-understood, routine, or conventional, as it is directed to improvements in error reduction and counting of cfDNA molecules, including improvements in assessing cfDNA fragments that were present in a sample but not sequenced.

101.    Furthermore, dependent claims 7 and 28 recite:

> wherein the plurality of polynucleotide molecules is tagged with n different combinations of molecular barcodes, wherein n is at least 2 and no more than 100,000*z, wherein z is a mean of an expected number of duplicate molecules in the sample of double-stranded polynucleotide molecules that map to identical start and stop positions on a reference sequence.

102.    Dependent claims 8 and 29 further limit claims 7 and 28, respectively, to "1,000*z."

103.    This element, in combination with the other elements of the claims, was not present in the prior art.  The USPTO found this innovation is directed to solving a problem of ensuring

enough tags to differentiate "cognates" (i.e., original cfDNA fragments with identical start and stop mappings) while still allowing use of non-unique tags.  The technique of applying between 2 and 100,000*z different combinations of molecular barcodes for tagging and tracking cfDNA molecules was not taught in the prior art and improves the functionality of tagging for DNA fragments.  *See* Exhibit T (finding claim reciting similar limitation non-obvious in final written decision), *vacated in part on other grounds sub nom. Guardant Health, Inc. v. Vidal*, No. 2021-1104, 2023 U.S. App. LEXIS 11037 (Fed. Cir. May 5, 2023) (vacating finding of obviousness for other claims).  It is thus unconventional, not routine, and not well-understood, including as shown by the USPTO's decision.

104.    Additionally, not only are the elements identified above unconventional and innovative, the ordered combination of the elements of each of the '961 Patent claims recite an invention that is not routine or conventional.

105.    In sum, the '961 Patent claim elements, individually and as an ordered combination, present an innovative technique for sequencing cell free DNA that was neither conventional nor routine nor well-understood.

106.    Each of the Accused xM Tests, and Tempus's use of each of the Accused xM Tests, practices steps that are identical or equivalent to each claimed element of the patented invention pointed out by at least claim 1 of the '961 Patent.

107.    Tempus is not licensed or otherwise authorized to practice the claims of the '961 Patent.

108.    On information and belief, Tempus has infringed and continues to infringe one or more claims of the '961 patent pursuant to 35 U.S.C. § 271(a), including at least claim 1, literally or under the doctrine of equivalents, by its use of the Accused Tests within the United States,

without authority.  As an example, attached as Exhibit M is a preliminary and exemplary claim chart illustrating one way in which Tempus infringes claim 1 of the '961 patent.

109.    Thus, by its acts, Tempus has injured Guardant and is liable to Guardant for directly infringing one or more claims of the '961 Patent, whether literally or under the doctrine of equivalents.

110.    As a result of Tempus's infringement of the '961 Patent, Guardant has suffered monetary damages, and seeks recovery, in an amount to be proven at trial, adequate to compensate for Tempus's infringement, but in no event less than a reasonable royalty with interest and costs.

111.    On information and belief, Tempus will continue to infringe the '961 Patent unless enjoined by this Court.  Tempus's infringement of Guardant's rights under the '961 Patent will continue to damage Guardant, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Guardant prays for judgment and seeks relief from Tempus as follows:

a.    For judgment that Tempus has infringed and continues to infringe the claims of the Patents-in-Suit;

b.    For an injunction against Tempus and its respective officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all other acting in active concert therewith from infringement of the Patents-in-Suit;

c.    For an accounting of all damages sustained by Guardant as a result of Tempus's acts of infringement;

d.      For a judgment that Guardant be awarded all damages adequate to compensate it for Tempus's infringement of the Patents-In-Suit, such damages to be determined by a jury and an accounting, if necessary, to compensate adequately Guardant for the infringement;

e.      For a mandatory future royalty payable by Tempus for each use of an Accused Test that is found to infringe one or more of the Patents-in-Suit and all future products which are not colorably different from products found to infringe, to the extent not enjoined;

f.      For a judgment and order requiring Tempus to pay Guardant's damages, costs, expenses, and pre- and post-judgment interest for its infringement of the Patents-in-Suit as provided under 35 U.S.C. § 284;

g.      For a judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to Guardant its reasonable attorneys' fees; and

h.      For such other and further relief in law and in equity as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Guardant demands a trial by jury in this action for all issues triable by a jury.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Jordan R. Jaffe
Wendy L. Devine
WILSON SONSINI GOODRICH & ROSATI
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Tel:  (415) 927-2171

Michael T. Rosato
Eric P. Tuttle
Colleen M. McCullough
WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104
Tel:  (206) 883-2529

Dated: August 12, 2025
12412076 / 24188.00003

By:  */s/ David E. Moore*
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Tel:  (302) 984-6000
    dmoore@potteranderson.com
    bpalapura@potteranderson.com

*Attorneys for Plaintiff Guardant Health, Inc.*